QUARLES & BRADY LLP
Firm State Bar No. 00443101
One South Church Avenue, Suite 1700
Tucson, Arizona 85701-1621
Telephone: (520) 770-8700

Kasey C. Nye, Esq. (AZ#020610)
E-mail: kasey.nye@quarles.com
Susan G. Boswell, Esq. (AZ#004791)
E-mail: susan.boswell@quarles.com

*Counsel to Appellees Reorganized Debtors*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>TRANSWEST RESORT PROPERTIES, INC.,<br><br>Debtor.<br><br>Jointly Administered with:<br>TRANSWEST TUCSON PROPERTY, L.L.C., TRANSWEST HILTON HEAD PROPERTY, LLC, TRANSWEST TUCSON II, LLC, TRANSWEST HILTON HEAD II, LLC<br><br>JPMCC 2007-C1 GRASSLAWN LODGING LLC,<br><br>Appellant,<br>v.<br>TRANSWEST RESORT PROPERTIES, INC., TRANSWEST TUCSON PROPERTY, L.L.C., TRANSWEST HILTON HEAD PROPERTY, LLC, TRANSWEST TUCSON II, LLC, TRANSWEST HILTON HEAD II, LLC<br><br>Appellees. | Case No. 4:12-cv-00024-RCC<br><br>BK No. 4:10-bk-37134-EWH<br>Jointly Administered with Case Nos.:<br>4:10-bk-37160-EWH<br>4:10-bk-37170-EWH<br>4:10-bk-37151-EWH<br>4:10-bk-37145-EWH<br><br>**REPLY TO OBJECTION TO MOTION OF REORGANIZED DEBTORS TO DISMISS APPEAL AS EQUITABLY MOOT**<br><br>**[ORAL ARGUMENT REQUESTED]**<br><br>Hearing Date:<br>Time:<br>Location: |

Since the Plan was confirmed, a series of complicated and interrelated transactions have occurred leading to Debtors' comprehensive reorganization and full consummation of the Plan. In the Objection [Docket No. 56] ("**Objection**") filed by JPMCC 2007-C1 Grasslawn Lodging, L.L.C. ("**Appellant**") to Appellees'[1] motion to dismiss this appeal as

---

[1] Capitalized terms that are not otherwise defined shall have the same meaning as in the Motion.

QB\16415304.1

equitably moot [Docket No. 52] (the "**Motion**"), Appellant fails to address the substantial record in this matter that supports dismissal of the appeal and demonstrates it is impossible to grant relief without effectively undermining the Plan in its entirety and inequitably impairing the interests of numerous third parties that are not before this Court.

Rather than addressing the actual circumstances, Appellant instead relies on a series of mischaracterizations concerning, among other things, the Debtors' status, the Plan and the Confirmation Order, the terms of pre-bankruptcy loan documents and the post-confirmation amended Loan Documents. Indeed, although Appellant seems to imply that there is no factual basis to support dismissal beyond bald assertions, the Objection entirely fails to mention, much less rebut or dispute the extensive declaration testimony from Mark Robinson [Docket No.54] (the **"First Robinson Declaration"**) and Mark Schlossberg [Docket No. 55] (the **"Schlossberg Declaration"**) that describe in detail the complex and interrelated transactions implementing the Plan in accordance with the Confirmation Order. The Objection also fails to mention the declaration testimony of William J. Webster of Starwood Hotels & Resorts Worldwide, Inc.[2] ("**Starwood**") [Docket No. 53] (the **"Webster Declaration"**) describing Starwood's participation in the Reorganization Cases and reliance on the Confirmation Order. Likewise, Appellant fails to submit any declarations to support its contention that the Plan has not been substantially consummated. Appellees therefore respectfully submit that the Objection should be overruled and the Motion dismissing this appeal should be granted.

**I.     Appellant Misrepresents the Terms of the Plan, and Interrelated Transactions That Have Been Consummated Pursuant to the Confirmation Order.**

Contrary to Appellant's characterization, Appellees' are not simple holding companies (referred to in the Objection as "Property Debtors") that passively own real property (referred to in the Objection as "Properties"). Rather, the Debtors, subject to a complex corporate and capital structure, own two large Resorts that operate hotels, spas, bars, restaurants, country clubs, golf, and convention businesses that touch thousands of

---

[2] Starwood is not a party to this appeal.

guests and hundreds of employees, vendors and members.

Despite Appellant's claims, the Plan did not effectuate a simple two-party loan modification and asset sale.  Instead, the Plan effectuated a complex and comprehensive restructuring of the Debtors' capital, management, operational and ownership structures. In fact, as described in the Motion and supporting declarations, implementing the Plan has involved a series of complex and inter-related transactions including:

- SWVP's management team assuming control over the Reorganized Debtors.
- Executing and recording a complex series of documents to reflect the cancellation or the Operating Debtors' membership interests, the issuance of new membership interests in the Reorganized Debtors, changing the names of the Reorganized Debtors, and executing new company governance documents.
- The Operating Debtors' property re-vested into the Reorganized Debtors.
- Changing all of the Reorganized Debtors bank accounts, including establishing reserve accounts and perfecting liens against those accounts in favor of Appellant.
- Recapitalizing the Reorganized Debtors' operating accounts with $2.5 million each.
- Providing funding to the Reorganized Debtors and causing them to pay secured and unsecured claims.
- Executing and delivering modified loan documents.
- Executing and delivering amended management agreements, including the Property Improvement Plans and executing replacement Amended and Restated Agreement and Consent, Subordination, Non-disturbance and Attornment Agreements ("SNDAs") to replace the facially defective SNDAs.
- Taking additional steps related to management and marketing the Resorts, implementing creditor distributions and implementing the property improvement plans.

Nevertheless, Appellant mischaracterizes basic facts about the case, the terms of the pre-bankruptcy loan documents, the Bankruptcy Court's decision to confirm the Plan, the terms of the Plan, and the steps taken to implement the Plan.

For example, Appellant claims that SWVP LP-HH "has actually put very little, if any, money into the Reorganized Debtors."  Objection at 2.  However, this statement is directly contradicted by the Robinson and Schlossberg Declarations indicating that over $16 million dollars has already been invested pursuant to the Plan.  In addition, simultaneously with filing this Objection, Appellees are submitting the Second Declaration of Mark H. Robinson which describes in detail the additional investment in

the Property Improvement Plans (with $1.2 million of additional contracts executed — now totaling over $3.8 million— and more than $400,000 of additional payments made for a total of more than $1.2 million) in the 29 days since his initial declaration. On page 2 line 24, the Objection states that the bankruptcy court "approved a *de facto* substantive consolidation of the Debtors." This claim is misleading. The Bankruptcy Court's primary holding was that the plain language of §1129(a)(10) required analysis on a per plan, not a per debtor basis.[3]

The Objection also states that there was only an "unsigned commitment" to provide capital to fund the Plan. Objection at 4-5. This is false. The Confirmation Order actually *requires* the capital investment, and the amended management agreements executed in connection with, and in reliance on, the Confirmation Order equally require implementation and funding the capital necessary for the Property Improvement Plans. The Amended and Restated Loan Agreement that was delivered to Appellant also requires the funding of the Debt Service Reserve, funding for taxes and insurance, and the timely completion and funding of the Property Improvement Plans. In fact, the failure to fund any of these capital commitments would be breaches of the Plan or the applicable document entitling the counter party (including Appellant) to pursue its remedies. Appellant's assertion that $12 million of the funds invested in the Reorganized Debtors are held in "reserves" is incorrect, because $5 million of this amount is working capital available to Reorganized Debtors' for immediate use in operating the Resorts. *Id.*

Appellant's mischaracterizations of its rights under the prepetition loan documents are particularly egregious. Appellant never had a right to consent to the sale of an

---

[3] As the Bankruptcy Court properly noted Section 1129 has more than 16 subsections setting forth various requirements for plan confirmation. Some of those requirements apply to the "proponent of the plan," some apply to the debtor, some apply to "any successor of a debtor," some apply to "each class of claims," and some only apply to "individual debtors;" but the section complained of by Appellant requires "If a class of claims is impaired ***under the plan***, at least one class of claims that is impaired ***under the plan*** has accepted ***the plan***, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10)[Emphasis supplied]. Congress could easily have expressly made the requirement apply to each debtor, but did not.

individual property under the pre-bankruptcy loan documents. The original loan agreement allocated the principal balance between the two Resorts and required a payment of 115% of the allocated loan amount as a release price for an individual resort. In addition, Section 3.3.1 of the Plan provided for sale or refinance of individual Resort "*upon payment of an agreed upon release price*, or at the direction of the Bankruptcy Court." [emphasis supplied]. Despite Appellant's claim, its right to condition a cash sale of the two Resorts together on payment in full was not annulled. In fact, the opposite is true given that Section 3.3.1 of the Plan specifically provides that "[t]he Reorganized Debtors may at any time prior to maturity of the Replacement Notes, sell or refinance the Resorts without penalty or premium *in exchange for payment of the outstanding balance of the Allowed Senior Lender Claim*." [emphasis supplied].

Appellant materially misstates the conditions on such transfer under the Plan by claiming it allows the Reorganized Debtors at "anytime between the 5th and 15th year after the Effective Date, to transfer the Properties *subject only to* the continued obligation of the transferee to pay the monthly payments due the Senior Lender under the Plan (upon the payment of a modest fee and other limited conditions arbitrarily imposed by the Bankruptcy Court)." [emphasis supplied]. To the contrary, section 3.3.1 of the Plan also requires, among other things, "(c) the Senior Lender approves that transferee, which approval may only be reasonably withheld based upon the financial qualifications of the transferee or the hotel management experience of the hotel manager proposed by the transferee." In other words the Plan requires the Reorganized Debtors to obtain Appellant's consent to transferring the Resorts subject to the loan.[4]

---

[4] Appellant's claim that Appellees have failed to address the equitable mootness standards established in *In re Thorpe Insulation Co.*, No. 10-56543, 2012 U.S. App. LEXIS 1272, (9th Cir. Jan. 24, 2012) is also without basis. To the contrary, Appellees prominently cite and discuss *Thorpe Insulation* as the primary authority in the Motion. Appellant's Objection also accuses the Motion of misapplying the first prong of the *Thorpe Insulation* test regarding the failure to obtain a stay pending appeal. Though this prong is not dispositive (because the appellants did seek a stay), it is certainly relevant that two courts have held that the appellants could not establish a likelihood of success on the merits.

**II.   The Unrebutted Evidence Presented by Appellees Establishes That the Plan Has Been Substantially Consummated and Third Parties Have Relied on the Confirmation Order.**

### A.   Appellant Does Not Deny the Evidence Establishing Substantial Consummation

As explained in the Motion, substantial consummation of a chapter 11 plan of reorganization occurs when "all or substantially all of the property proposed by the plan to be transferred" has been transferred, the debtor or its successor has assumed the business or management "of all or substantially all of the property dealt with by the plan" and "distribution under the plan" has commenced.  11 U.S.C. § 1101(2); *see also Thorpe Insulation*, ___ F.3d ___, 2012 WL 178998, #6 (9th Cir. 2012).[5]

Here, the Schlossberg Declaration describes in detail the numerous events that have occurred following the Plan's confirmation including, among other things, transfers and complete revesting of property from the Operating Debtors to the Reorganized Debtors, renaming the Reorganized Debtors in Delaware's corporate records, execution of amended management agreements with Starwood and the ratification of Property Improvement Plans, execution and delivery of amended and restated loan documents, assumption of the Operating Debtors' business by the Reorganized Debtors, installation of its new management team, and hands on activity of that team with respect to the Resorts' renovation and interaction with senior hotel management, and involvement with marketing the new ownership to Resort customers.  The declaration also addressed the distributions to literally hundreds of creditors made pursuant to the Plan.

Critically, Appellant ignores these transactions and events and does not seek to rebut or seek to contradict the content of that testimony, which proves that the Plan has been substantially consummated, with any evidence whosoever.  Instead, Appellant only references what it views as the amount of funds and distributions to creditors that have been made to date, citing *Thorpe Insulation* as support for its contention that the Plan has not been substantially consummated.  Appellant's reliance on *Thorpe Insulation* is

---

[5] According to Westlaw, the cite given was superseded by an amended opinion issued today, April 3, 2012, but as of yet, such opinion is unavailable to counsel.

misplaced and the circumstances in that case are easily distinguishable because the plan involved an asbestos trust under 11 U.S.C. § 524(g).  In *Thorpe Insulation*, the plan required the funding of the asbestos trust with cash that would ultimately be distributed to compensate product liability tort creditors, instead of the restructuring of a going concern like the Reorganized Debtors in this case.  At the time of the appeal, the trust had only been partially funded and only partial distributions had been made to creditors.  Because only a portion of the property to be transferred under the plan - i.e., the substantial majority of cash necessary to fund the trust had yet to be deposited - the Ninth Circuit concluded that "all or substantially all of the property *the plan proposes to transfer* [had] not been transferred" and the plan had therefore not been substantially consummated. *Id*. at *6 (emphasis added).

In this case, the property to be transferred under the Plan has already fully revested from the debtor-in-possession bankruptcy estates in the Reorganized Debtors such that "all or substantially all of the property the plan proposes to transfer" has actually been transferred, resulting in the substantial consummation of the Plan.  Appellant's reliance on the amount of distributions to support its contention that the Plan has not been substantially consummated is not only contradicted by *Thorpe Insulation*, but ignores the plain language of 11 U.S.C. § 1101(2) that provides that substantial consumnation occurs when "all or substantially all of the property proposed by the plan to be transferred" has been transferred and "distribution under the plan" to creditors has simply *commenced*.  Consequently, although substantial consummation requires that all or substantially all property to be transferred under a plan to have actually been transferred, it only requires that distributions to creditors to have commenced.  In this instance, both circumstances are satisfied.

**B.    Third Parties Have Relied on the Confirmation Order and Appellant Makes No Showing to the Contrary.**

Appellant claims that "the parties that may be affected by the outcome of the Appeal ― SWVP and the Reorganized Debtors ― are all before the Court," which is not true. Objection at 14.  In fact, there are many third parties that are not before this Court

that will be detrimentally impacted by this appeal.

For example, Appellant entirely ignores the Webster Declaration which describes in detail the impact of the Plan on Starwood, and the impact reversal of the Plan would have on Starwood. Starwood is not a party to this appeal and would be substantially harmed if Appellant successfully vacates the Confirmation Order. Appellant also entirely fails to account for the impact on third parties that have entered into contracts related to the renovations or related to ongoing operations. The Property Improvement Plan at the La Paloma Resort will be implemented over 36 months. What happens if the Plan is reversed in month 16 with contractor payments pending, partially competed work on common areas, and substantial goods in transit? What could vendors and contractors, that obviously are not part of this appeal, do to protect themselves? What process would the Bankruptcy Court need to undertake to figure out what to do? Appellant addresses none of these issues. Clearly, there are substantial third party interests that would be affected by this appeal.

Appellant also suggests that third party reliance on the Confirmation Order is somehow absent because "SWVP knew when it infused money into the Reorganized Debtors that Appellant sought to stay the Confirmation Order and that the Appeal was pending." Objection at 14. Indeed, according to Appellant, because SWVP should have presumed that Appellant would pursue this appeal, all other parties should bear the risk that the Confirmation Order is reversed and vacated. Irrespective of the accuracy of this claim, it is incorrect as a matter of law.

It is well established that "[h]igh on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, *in particular investors*, on the finality of the transaction." *In re Continental Airlines*, 91 F.3d 553, 562 (3d Cir. 1996). The contrary position advanced by Appellant would turn the entire doctrine of equitable mootness on its head. The point of equitable mootness is that parties are entitled to rely on an unstayed order. If the threat of an appeal by a party disappointed with the outcome of the

confirmation process were sufficient to defeat equitable mootness, then no party would ever be able to rely on an unstayed confirmation order, and no party would agree to implement any provision of a plan until all the appeals were resolved.  Thus, even though a third party investor may be aware that an appeal of an order confirming a plan of reorganization is pending, the "inquiry should not be about the 'reasonableness' of [the investor's] reliance [on the confirmation order] or the probability of either party succeeding on appeal." *Id.* at 565.

Instead, the appropriate focus is "[t]he strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization [which] clearly weighs in favor of encouraging [third party] reliance" on plan confirmation orders that have not been stayed pending appeal.  *Id.*  "Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine."  *Id.*  Simply put, "[w]here, as here, investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order," Appellant should not be permitted to proceed with its appeal to vacate the Confirmation Order and upset numerous interrelated transactions involving SWVP and other third parties.[6]  *Id.*

**III.   The remedies suggested by Appellant do not pass muster.**

Appellant suggests that an equitable remedy can be fashioned as to both its "due on sale" and its § 1129(a)(10) issue regarding the Mezzanine Debtors.  Appellant's suggested remedies, however, are not credible.

With respect to whether the Reorganized Debtors may transfer the Resorts together subject to the Restructured Loan, Appellant suggests that an appellate court could simply order that "transfer of the Properties or of a controlling interest in the New Equity ought to

---

[6] Appellant's apparent reliance on *In re Spirtos*, 992 F.2d 1004 (9th Cir. 1993) is misplaced.  Rather than addressing a complex Chapter 11 reorganization and third party reliance on an unstayed confirmation order, *Spirtos* involved an individual debtor that improperly received funds during a Chapter 7 liquidation and then sought to dismiss an appeal that could result in an order requiring the return of those funds to the bankruptcy estate.  *Id.*

QB\16415304.1                      -9-

require a repayment of the outstanding balance of the obligations to Appellant." This argument improperly suggests that this appeal hands the Court a pen to author an amended plan and impose its terms on third parties without their consent. To the contrary, the issue before this Court, is whether the Bankruptcy Court properly approved the Plan containing the ability to transfer the Resorts subject to Appellant's claim under 11 U.S.C. § 1129 in light of Appellant's §1111(b) election.

Appellant's suggested remedies regarding the Mezzanine Debtor § 1129(a)(10) issue make even less sense:

> (1) restore the pre-confirmation status quo, return the extinguished equity interests to the Mezzanine Debtors and require the Mezzanine Debtors to obtain the consent of the Mezzanine Lender in order to confirm a new plan;
>
> (2) to the extent SWVP has provided actual benefit to the Properties in the interim, require a *quantum meruit* recovery for the benefit of SWVP, restoring the entire status quo ante;
>
> (3) require a payment to the Mezzanine Lender equal to the value of the New Equity that was issued to SWVP, essentially reversing the fiction that the equity position acquired by SWVP was valueless; or
>
> (4) impose a replacement lien on the New Equity in favor of the Mezzanine Lender to allow the Mezzanine Lender to recover the value of its collateral at a future date.

*See* Objection 15. It is not clear that any court would have the ability to craft these "solutions," let alone impose them on third parties without their consent.

For example, the third suggestion fails to acknowledge the undeniable fact that, as a direct result of the stipulation between the Debtors and Appellant that the Resorts were worth $92,250,000, the Mezzanine Debtors (and hence the Mezzanine Lender) had no right to receive any property on account of their membership interests in the Operating Debtors until the full amount of Appellant's secured claim and all of the Operating Debtors' unsecured claims were paid in full. To issue a "solution" requiring any payment or granting any "replacement lien" in this instance would create value where none exists and violate the absolute priority rule, as well as prejudice SWVP LP-HH.

The fourth suggestion would eliminate the benefit of the bargain for SWVP LP-HH, which has relied on the terms of the Plan and the Confirmation Order in providing its investment, and purport to impose on SWVP LP-HH a materially worse investment and

compel it to receive equity interests now subject to an encumbrance securing tens of millions in effectively new debt.

With respect to the second suggestion, Appellant is notably silent regarding the source of funds to satisfy the so-called *quantum meruit* claim that would be granted to SWVP LP-HH, or even how that claim would be calculated. Further, none of these supposedly available "remedies" address any of the other third parties that would be impacted by the appeal, such as Starwood and the contractors that are performing the work under the Property Improvement Plan. In sum, Appellant's suggestion that "none of these remedies would impact the day-to-day operation of the Properties of affect any innocent third-party doing business with the Reorganized Property Debtors" is absurd.

Even if the Plan could be reversed with respect to the Mezzanine Debtors, it would not result in Appellant receiving the drastic relief that it seeks in this appeal. Appellant has apparently never recognized that the equity interests held by the Mezzanine Debtors are being extinguished as part of the treatment of claims against and interests in the *Operating Debtors*. Consequently, even if the Plan were reversed with respect to the Mezzanine Debtors and the equity interests in the Operating Debtors were somehow "revived," the response would be to simply dismiss the Mezzanine Debtors from the Plan and allow the Operating Debtors to confirm the Plan. Because the Plan would remain binding against creditors and equity holders of the Operating Debtors - *including the Mezzanine Debtors* - those equity interest would again be extinguished. The Reorganized Debtors respectfully suggest that it is a waste of resources to go through briefing and argument on appeal only to dismiss the underlying case with respect to the Mezzanine Debtors, to the extent this is outcome sought by Appellant.

**IV. CONCLUSION.**

For the foregoing reasons, this Court should overruled the Objection and dismiss the appeal.

RESPECTFULLY SUBMITTED this 3rd day of April, 2012.

QUARLES & BRADY LLP
One South Church Avenue
Suite 1700
Tucson, Arizona 85701-1621


By  */s/ Kasey C. Nye*
    Kasey C. Nye
    Susan G. Boswell

Counsel to Reorganized Debtors

# CERTIFICATE OF SERVICE

I hereby certify that on April 3, 2012, I electronically transmitted the attached document to the Office of the Clerk of the District Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

- susan.boswell@quarles.com
- foutzj@ballardspahr.com
- harnischa@ballardspahr.com
- minkine@ballardspahr.com
- kasey.nye@quarles.com
- sorensenp@gtlaw.com
- clearyd@gtlaw.com
- waldtd@ballardspahr.com
- pearsonj@ballardspahr.com
- eobrien@swlaw.com
- dgaffney@swlaw.com

I hereby certify that on April 3, 2012, I served the attached document by First Class U.S. Mail on the following, who are not registered participants of the CM/ECF System:

The Hon. Eileen W. Hollowell
United States Bankruptcy Court
District of Arizona
James A. Walsh Courthouse
38 South Scott Avenue, Room 100
Tucson, Arizona 85701-1704

*/s/ Sattie Sumeer*